1

2

3

4

5

6

7

8                          IN THE UNITED STATES DISTRICT COURT

9                        FOR THE EASTERN DISTRICT OF CALIFORNIA

10   DAVID W. WILSON,

11              Plaintiff,                    No. CIV S-06-0791 FCD GGH P

12       vs.

13   DIRECTOR OF THE DIVISION
14   OF ADULT INSTITUTIONS, et al.,        FINDINGS AND RECOMMENDATIONS

15              Defendants.

16   _____/

17   Introduction

18              Plaintiff, a state prisoner proceeding pro se, seeks relief under 42 U.S.C. § 1983.

19   Pending before the court is defendants' motion for summary judgment, filed on May 21, 2010, to

20   which plaintiff filed his opposition, after which defendants' filed their reply.

21   Plaintiff's Allegations

22              The claims upon which this case is proceeding have been previously set forth by

23   the court and are borrowed herein from a prior order and findings and recommendations, filed on

24   February 9, 2009 (docket # 31) with any necessary subsequent modifications.[1]   This action, filed

25   _____

26        [1] Plaintiff's allegations were set forth in Findings and Recommendations at pp. 1-2, filed
     on February 9, 2009 (docket # 31), and adopted by Order, filed on March 12, 2009 (docket # 32).

on April 12, 2006, now proceeds on plaintiff's second amended complaint, filed on June 13, 2007, as modified by the order, filed on June 27, 2008, dismissing several defendants and all claims except for an Eighth Amendment claim against defendants Dr. Hunt and Dr. Peterson for their alleged failure to provide adequate medical care for plaintiff, i.e., in the form of a medical chrono permitting plaintiff not to wear newly issued clothing which has large painted lettering that caused plaintiff to break out in rashes.

Specifically, plaintiff alleges that, on January 14, 2004, while he was incarcerated at R.J. Donovan (RJD), all inmates were ordered to exchange their state-issued pants and shirts for new-styled pants and shirts that had large stenciled lettering.  On January 16, 2004, plaintiff began to itch where the large lettering was located and submitted a health care request for a chrono that would permit plaintiff to wear the old-style pants.  On January 22, 2004, plaintiff showed defendant Hunt his leg and back rashes.  Defendant Hunt gave plaintiff skin cream but, stating that the new clothing was a custody issue, refused to provide a chrono for plaintiff not to be required to wear the new clothing.  Second Amended Complaint (SAC), p. 3.

Following his appeal of the issue, filed on February 17, 2004, plaintiff was seen, on February 25, 2004, by defendant Peterson, a dermatologist, who, evidently without accessing plaintiff's medical history with regard to rashes, also stated that he could not provide plaintiff with a chrono (per a Dr. Ritter, not a defendant), but did give plaintiff skin cream.  The actions by these defendants violated plaintiff's Eighth Amendment rights. SAC, p. 4.

Within his second amended complaint, plaintiff references having been transferred from RJD to California Men's Colony - East (CMC-E) to California Medical Facility-Vacaville (CMF).[2]  SAC, p. 4.  Plaintiff's subsequent prison appeals have evidently

Subsequent Findings and Recommendations, inter alia, also setting forth plaintiff's allegations (at pp. 1-2), filed on March 29, 2010 (docket # 61), were adopted by Order filed on May 14, 2010 (docket # 63).

[2]  According to the court's case docket, plaintiff filed a notice of change of address in another case which has been noted in this case as filed on 9/24/07, indicating that plaintiff is

been denied, and plaintiff has been subjected to pain and suffering in the form of "itching and

scratching," as a result of not being excepted from wearing the newer clothing with the large

stenciled lettering.  Plaintiff seeks declaratory and injunctive relief, as well as money

damages. SAC, pp. 4-7.

The case docket indicates that subsequent to his transfer to CMF, plaintiff has

filed notices of change of address to California State Prison - Lancaster (on September 26, 2007)

(docket # 14)); to California State Prison - Solano (on March 27, 2009) (docket # 33); and to RJ

Donovan (RJD) (on August 3, 2009) (docket # 37).  Thus, plaintiff appears to be currently

housed at RJD.

<u>Motion for Summary Judgment</u>

Defendants move for summary judgment on the ground that plaintiff cannot

establish that defendants Hunt and Peterson acted with deliberate indifference to a serious

medical need in violation of the Eighth Amendment with respect to plaintiff and on the ground

that they are entitled to qualified immunity.  Notice of Motion for Summary Judgment.

*Summary Judgment Standards under Rule 56*

Summary judgment is appropriate when it is demonstrated that there exists "no

genuine issue as to any material fact and that the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(c).

Under summary judgment practice, the moving party

> always bears the initial responsibility of informing the district court
> of the basis for its motion, and identifying those portions of "the
> pleadings, depositions, answers to interrogatories, and admissions
> on file, together with the affidavits, if any," which it believes
> demonstrate the absence of a genuine issue of material fact.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (quoting Fed. R. Civ.

P. 56(c)).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive

currently housed at California State Prison - Lancaster.

1    issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings,

2    depositions, answers to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment

3    should be entered, after adequate time for discovery and upon motion, against a party who fails to

4    make a showing sufficient to establish the existence of an element essential to that party's case,

5    and on which that party will bear the burden of proof at trial.  See id. at 322, 106 S. Ct. at 2552.

6    "[A] complete failure of proof concerning an essential element of the nonmoving party's case

7    necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment

8    should be granted, "so long as whatever is before the district court demonstrates that the standard

9    for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323, 106 S. Ct. at

10   2553.

11           If the moving party meets its initial responsibility, the burden then shifts to the

12   opposing party to establish that a genuine issue as to any material fact actually does exist.  See

13   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356

14   (1986).  In attempting to establish the existence of this factual dispute, the opposing party may

15   not rely upon the allegations or denials of its pleadings but is required to tender evidence of

16   specific facts in the form of affidavits, and/or admissible discovery material, in support of its

17   contention that the dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11,

18   106 S. Ct. at 1356 n. 11.  The opposing party must demonstrate that the fact in contention is

19   material, i.e., a fact that might affect the outcome of the suit under the governing law, see

20   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); T.W. Elec.

21   Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the

22   dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the

23   nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

24           In the endeavor to establish the existence of a factual dispute, the opposing party

25   need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

26   claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

4

1  versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

2  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

3  genuine need for trial.'" Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P.

4  56(e) advisory committee's note on 1963 amendments).

5          In resolving the summary judgment motion, the court examines the pleadings,

6  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

7  any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

8  477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

9  court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587, 106 S. Ct.

10  at 1356.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's

11  obligation to produce a factual predicate from which the inference may be drawn.  See Richards

12  v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902

13  (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than

14  simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record

15  taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

16  'genuine issue for trial.'" Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (citation omitted).

17          On May 16, 2008, the court advised plaintiff of the requirements for opposing a

18  motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v. Rowland, 154

19  F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v. Eikenberry, 849 F.2d 409, 411-12 (9th Cir.

20  1988).

21          The above advice would, however, seem to be unnecessary as the Ninth Circuit

22  has held that procedural requirements applied to ordinary litigants at summary judgment do not

23  apply to prisoner pro se litigants.  In Thomas v. Ponder, 611 F.3d 1144 (9th Cir. 2010), the

24  district courts were cautioned to "construe liberally motion papers and pleadings filed by *pro se*

25  inmates and ... avoid applying summary judgment rules strictly."  Id. at 1150.  No example or

26  further definition of "liberal" construction or "too strict" application of rules was given in Ponder

1   suggesting that any jurist would know inherently when to dispense with the wording of rules.

2   Since the application of any rule which results in adverse consequences to the pro se inmate

3   could always be construed in hindsight as not liberal enough a construction, or too strict an

4   application, it appears that only the essentials of summary judgment, i.e., declarations or

5   testimony under oath, and presentation of evidence not grossly at odds with rules of evidence,

6   apply in this dichotomous litigation system where one side must obey the written rules and the

7   other side is substantially absolved from doing so.

8                        *Legal Standard for Eighth Amendment Claim*

9              In order to state a § 1983 claim for violation of the Eighth Amendment based on

10   inadequate medical care, plaintiff must allege "acts or omissions sufficiently harmful to evidence

11   deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct.

12   285, 292 (1976).  To prevail, plaintiff must show both that his medical needs were objectively

13   serious, and that defendants possessed a sufficiently culpable state of mind.  Wilson v. Seiter,

14   501 U.S. 294, 299, 111 S. Ct. 2321, 2324 (1991); McKinney v. Anderson, 959 F.2d 853 (9th Cir.

15   1992) (on remand).  The requisite state of mind for a medical claim is "deliberate indifference."

16   Hudson v. McMillian, 503 U.S. 1, 4, 112 S. Ct. 995, 998 (1992).

17             A serious medical need exists if the failure to treat a prisoner's condition could

18   result in further significant injury or the unnecessary and wanton infliction of pain.  Indications

19   that a prisoner has a serious need for medical treatment are the following:  the existence of an

20   injury that a reasonable doctor or patient would find important and worthy of comment or

21   treatment; the presence of a medical condition that significantly affects an individual's daily

22   activities; or the existence of chronic and substantial pain.  See, e.g., Wood v. Housewright, 900

23   F. 2d 1332, 1337-41 (9th Cir. 1990) (citing cases); Hunt v. Dental Dept., 865 F.2d 198, 200-01

24   (9th Cir. 1989).  McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992), overruled on other

25   grounds, WMX Technologies v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

26             In Farmer v. Brennan, 511 U.S. 825, 114 S. Ct. 1970 (1994) the Supreme Court

1   defined a very strict standard which a plaintiff must meet in order to establish "deliberate

2   indifference." Of course, negligence is insufficient. Farmer, 511 U.S. at 835, 114 S. Ct. at 1978.

3   However, even civil recklessness (failure to act in the face of an unjustifiably high risk of harm

4   which is so obvious that it should be known) is insufficient. Id. at 836-37, 114 S. Ct. at 1979.

5   Neither is it sufficient that a reasonable person would have known of the risk or that a defendant

6   should have known of the risk. Id. at 842, 114 S. Ct. at 1981.

7           It is nothing less than recklessness in the criminal sense – subjective standard –

8   disregard of a risk of harm of which the actor is actually aware. Id. at 838-842, 114 S. Ct. at

9   1979-1981. "[T]he official must both be aware of facts from which the inference could be drawn

10  that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837,

11  114 S. Ct. at 1979. Thus, a defendant is liable if he knows that plaintiff faces "a substantial risk

12  of serious harm and disregards that risk by failing to take reasonable measures to abate it." Id. at

13  847, 114 S. Ct. at 1984. "[I]t is enough that the official acted or failed to act despite his

14  knowledge of a substantial risk of serious harm." Id. at 842, 114 S. Ct. at 1981. If the risk was

15  obvious, the trier of fact may infer that a defendant knew of the risk. Id. at 840-42, 114 S. Ct. at

16  1981. However, obviousness per se will not impart knowledge as a matter of law.

17          Also significant to the analysis is the well established principle that mere

18  differences of opinion concerning the appropriate treatment cannot be the basis of an Eighth

19  Amendment violation. Jackson v. McIntosh, 90 F.3d 330 (9th Cir. 1996); Franklin v. Oregon,

20  662 F.2d 1337, 1344 (9th Cir. 1981).

21          Moreover, a physician need not fail to treat an inmate altogether in order to violate

22  that inmate's Eighth Amendment rights. Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir.

23  1989). A failure to competently treat a serious medical condition, even if some treatment is

24  prescribed, may constitute deliberate indifference in a particular case. Id.

25          Additionally, mere delay in medical treatment without more is insufficient to state

26  a claim of deliberate medical indifference. Shapley v. Nevada Bd. of State Prison Com'rs, 766

F.2d 404, 408 (9th Cir. 1985).  Although the delay in medical treatment must be harmful, there is no requirement that the delay cause "substantial" harm.  McGuckin, 974 F.2d at 1060, citing Wood v. Housewright, 900 F.2d 1332, 1339-1340 (9th Cir. 1990) and Hudson, 112 S. Ct. at 998-1000.  A finding that an inmate was seriously harmed by the defendant's action or inaction tends to provide additional support for a claim of deliberate indifference; however, it does not end the inquiry.  McGuckin, 974 F.2d 1050, 1060 (9th Cir. 1992).  In summary, "the more serious the medical needs of the prisoner, and the more unwarranted the defendant's actions in light of those needs, the more likely it is that a plaintiff has established deliberate indifference on the part of the defendant."  McGuckin, 974 F.2d at 1061.

Superimposed on these Eighth Amendment standards is the fact that in cases involving complex medical issues where plaintiff contests the type of treatment he received, expert opinion will almost always be necessary to establish the necessary level of deliberate indifference.  Hutchinson v. United States, 838 F.2d 390 (9th Cir. 1988).  Thus, although there may be subsidiary issues of fact in dispute, unless plaintiff can provide expert evidence that the treatment he received equated with deliberate indifference thereby creating a material issue of fact, summary judgment should be entered for defendants.  The dispositive question on this summary judgment motion is ultimately not what was the most appropriate course of treatment for plaintiff, but whether the failure to timely give a certain type of treatment was, in essence, criminally reckless.

### *Undisputed Facts*

The following of defendants' undisputed facts, modified where necessary, are, upon the court's review, in fact, undisputed.  Other facts undisputed by the parties, whether set forth by defendants or not, are also included.  Although plaintiff did not comply with Local Rule 260(b), as defendants note (Reply, p. 4), in failing to specifically set forth those of defendants' undisputed facts that he disputes and citing evidentiary support for any challenge to those facts, the court is constrained by Thomas v. Ponder, supra, 611 F.3d 1144, to determine if his

1    opposition sets forth any basis for finding a material fact in dispute.[3]

2              On January 14, 2004, while plaintiff was incarcerated at R.J. Donovan (RJD), all

3    inmates were ordered to exchange their state-issued pants and shirts for new-styled pants and

4    shirts that had large stenciled lettering.[4]  Plaintiff claims the new-style of clothing caused him to

5    itch and scratch and break out in rashes.  Plaintiff has dealt with rashes due to skin sensitivities,

6    including exposure to the sun and wool, since before he was required to wear the new style of

7    clothing.  On January 16, 2004, plaintiff began itching and scratching on the areas of his body

8    touching the lettering on the new-style clothing.  The lettering on the new-style clothing is

9    painted across the center-middle of the back of the shirt and down the right leg of the pants.  On

10   January 22, 2004, plaintiff saw defendant Dr. Hunt for the rashes.  Plaintiff told defendant Hunt

11

12        [3] There is some irony in applying this lax standard to this plaintiff, who avers in his
     deposition that he has some 21 cases "current and/or pending."  Plaintiff's Deposition (Dep.) 16:
13   6-12.  In Sledge v. Kooi, 564 F.3d 105, 107-09 (2nd Cir. 2009), per curiam, the Second Circuit
     did not agree with the magistrate judge's action in having withdrawn the "special solicitude"
14   generally accorded pro se litigants by revoking plaintiff's pro se status for the entire action where
     the plaintiff had filed at least twelve other federal or state court actions or appeals and been
15   partially or wholly successful in at least three.  The magistrate judge therein reasoned "there are
     circumstances where an overly litigious inmate, who is quite familiar with the legal system and
16   with pleading requirements, may not be afforded [this] special solicitude." Id., at 107.  Although
     the Second Circuit noted "approvingly that the Magistrate Judge expressly indicated that he did
17   not intend to punish Sledge for excessive litigiousness, but rather merely to charge him with the
     responsibilities accompanying his manifest experience with civil litigation," the court found
18   nevertheless that to foreclose pro se status for the entire action on such a basis was not warranted,
     but did state, in dicta, that a "limited withdrawal of special status," i.e., in relation to the
19   requirements of opposing a summary judgment action might be found appropriate.  Id., at 109-
     110.  This court, however, is constrained by Thomas v. Ponder, supra, 611 F.3d 1144.
20

21        [4] A memorandum, with the subject "INMATE CLOTHING, dated January 14, 2004, to
     "All Concerned" signed by RJD Warden Robert Hernandez states in full: "The new style inmate
22   clothing was distributed to the Facility 1 inmate population during regular clothing exchange.
     All inmates are required to wear the clothing whenever exiting the Facility for their work
23   assignments, or when going to a visit.  Blue jumpsuits will still be issued to inmates at Facility 1
     work change.  The previously issued blue jeans and blue shirts will not be authorized in Facility
24   1.  This clothing will be forwarded to the laundry department for issuance to other Facilities.
     Facility 1 inmates will still be authorized to retain their personal clothing including blue jeans.
25   However, they may only wear the blue jeans in the Facility yard or housing units.  If you have
     any questions, please contact M.A. Chacon, Associate Warden (A) Business Services, at
26   extension 7866."  MSJ, Doc. # 66, Ex. 2 to Amended Declaration of Deputy Attorney General
     Michelle Angus, attached to, Ex. A, excerpts from plaintiff's deposition.

1    that the skin rash was a long-term problem.  Plaintiff asked defendant Hunt to renew a

2    prescription for 2.5% cortisone cream[5] that he had used successfully in the past.  Defendant Hunt

3    prescribed 2.5% hydrocortisone cream.  Defendant Hunt gave plaintiff several medical chronos

4    for issues unrelated to the skin rash.  MSJ, Document # 64-4,  Declaration of defendant Dr. Hunt,

5    ¶ 4.  Defendant Hunt did not give plaintiff a chrono excusing plaintiff from wearing the new-

6    style clothing.

7                    On February 25, 2004, plaintiff was seen by a dermatologist, defendant Dr.

8    Peterson.  Defendant Peterson is a contract physician who provides dermatological services to

9    CDCR.[6]  Neither defendant Hunt nor defendant Peterson had plaintiff's medical records at the

10   time that they say plaintiff.  According to defendant Peterson, when he examined plaintiff, "there

11   was no evidence of active dermatitis, only old hyper-pigmented scarring, primarily from

12   excoriation (scratching); he had a few papulos pustuler [sic] compatible with miliaria....more

13   commonly known as heat rash, secondary to body building."  MSJ, Document # 64-5,

14   Declaration of defendant Dr. Peterson, ¶ 5.  Defendant Peterson diagnosed plaintiff with miliaria,

15   or heat rash.  Since the weaker hydrocortisone had previously helped, defendant Peterson

16   believed the increased potency of the triamcinolone cream would provide relief.  Id.  (Plaintiff

17   asserts in his opposition (at p. 6) that it was he who asked for the triamcinolone, but whether he

18   did or not, that does not undermine defendant Peterson's declaration on the point, wherein he

19   states that plaintiff told him that 2.5% hydrocortisone cream helped him previously.  MSJ,

20   Document # 64-5, Peterson Dec., ¶ 5).   Plaintiff did not request further follow-up dermatological

21   care from defendant Peterson.  If plaintiff had asked defendant Peterson for a chrono excusing

22   plaintiff from wearing the standard-issue prison clothing, defendant Peterson would not have

23   recommended one because he believed such a chrono was not medically appropriate.   MSJ,

24

25          [5] Although the medications are occasionally identified as "crème" rather than "cream"
     within the motion, the court will use "cream" throughout.

26          [6] California Department of Corrections and Rehabilitation.

1    Document # 64-5, Peterson Dec., ¶ 7.   Defendant Peterson's professional opinion is that plaintiff

2    received proper, adequate, and professional medical care for his skin rash that was consistent

3    with community standards.  Id. at ¶ 8.  Defendant Peterson saw plaintiff only once, on February

4    25, 2004.

5                Plaintiff returned to defendant Hunt on March 16, 2004, for complaints

6    concerning the skin rash.  On exam, plaintiff had a rash with tiny blisters on his chest and

7    abdomen.[7]  At that time, plaintiff had seen the dermatologist, defendant Peterson, and defendant

8    Hunt reviewed defendant Peterson's report and diagnosis of heat rash.  MSJ, Document # 64-4,

9    Hunt Dec., ¶ 5.  Defendant Hunt discussed defendant Peterson's report with plaintiff.  Id.

10   Defendant Hunt renewed plaintiff's prescription for 2.5% hydrocortisone cream.  In defendant

11   Hunt's medical opinion, a chrono excusing plaintiff from wearing state-issued clothing was not

12   medically appropriate or justified because of the etiology of plaintiff's rash, i.e., heat rash.  Id., at

13   ¶ 7.  Defendant Hunt's professional opinion is that plaintiff received proper, adequate and

14   professional medical care for his skin rash consistent with community standards. Id., at ¶ 8.

15   Defendant Hunt only saw plaintiff two times on January 22, 2004, and March 16, 2004.

16                On August 4, 2004, plaintiff saw Dr. Armstrong (not a defendant).[8]  Dr.

17   Armstrong recommended that plaintiff undergo a RAST blood test that can be used to diagnose

18   specific allergies, such as wool allergies.  MSJ, Document # 64-4, Hunt Dec., ¶ 4.  Plaintiff

19   refused the RAST test and refused a follow-up visit.  Id.

20                Nobody has told plaintiff that the new-style clothing is the cause of his rashes.

21   _____

22      [7] While defendant Hunt describes the rashes as having been on plaintiff's chest and
     abdomen.  MSJ, Doc. # 64-4, Hunt Dec. ¶ 5, plaintiff has averred that the rashes were on his leg
23   and upper back and that defendant Hunt examined the rashes on his leg and back (apparently
     where large lettering was on the new-style shirt and pants).  SAC, p. 3, Opposition, p. 5.  But in
24   his deposition he describes the rash as covering his back, chest and stomach.  MSJ, Plaintiff's
     Lodged Deposition, pp. 50: 20-22.

25      [8] Plaintiff apparently confuses non-party Dr. Armstrong with defendant Dr. Peterson in
26   stating that he "has alleging a violation of his Eighth Amendment rights by defendants
     Armstrong and Hunt."  Opposition, Doc. # 67, p. 11.

1   MSJ, Doc. # 66, Ex. 2 to Amended Declaration of Deputy Attorney General Michelle Angus,

2   attached to, Ex. A, excerpts from plaintiff's deposition, at 40:24-42:18, 60:2-12.  The prescribed

3   2.5% hydrocortisone cream relieves the itching upon contact and cures the rash so long as it is

4   being applied.  Plaintiff claims defendant Hunt was deliberately indifferent to plaintiff's medical

5   needs because defendant Hunt did not give plaintiff a chrono excusing plaintiff from wearing the

6   new-style clothing, because defendant Hunt did not perform any kind of testing on plaintiff or the

7   new-style clothing to determine the cause of the rashes, and because defendant Hunt did not have

8   plaintiff's medical records during the medical visit with plaintiff.

9          Plaintiff claims defendant Peterson was deliberately indifferent to plaintiff's

10  medical needs because he failed to perform any kind of testing on plaintiff or the new-style

11  clothing to determine the cause of the rashes and for not having plaintiff's medical records at the

12  time of the February 25, 2004 medical visit.  Plaintiff contends that defendants Hunt and

13  Peterson treated the rash, but failed to treat the cause of the rashes.  Aside from hygienic

14  precautions, like avoiding unnecessary sweating and thorough bathing after exercising, the cause

15  of heat rash cannot be treated as only the resulting rash can be treated.  Neither defendant Hunt

16  nor defendant Peterson ever refused to provide plaintiff with the 2.5% hydrocortisone cream.

17  Plaintiff has not sought punitive damages.

18                    *Disputed Facts & Analysis*

19          While both defendants Hunt and Peterson aver that plaintiff did not request a

20  chrono from either of them (MSJ, Docket # 64-2, pp. 2-3, DUF[9] # 13, Hunt Dec. ¶¶ 4-5,  DUF #

21  25, Peterson Dec. ¶ 7), plaintiff is adamant that he had submitted a sick call request for a medical

22  chrono not to be required to wear the new pants and shirts to keep from breaking out, after which

23  he was initially seen by defendant Hunt, and that defendant Hunt told him a chrono was a

24  custody issue.  Opp., p. 4, Ex. C.  Ex. C is an unauthenticated copy of a Health Care Services

25

26          [9] Defendants' undisputed fact.

1 Request form with a typed-in date of 1-16-04, signed by plaintiff, indicating that he wanted to see

2 health care staff for a rash and containing a typed request for a:

> Medical Chrono not to wear new pants & shirt with some type of
> painted on lettering shirt 1 ½ ft. long by ½ ft. wid[e] by 2 ft. long.
> Which causes me to "itch" "scratch[.]"  Request chrono to wear
> old prison pants & shirt for not to break out on leg and back no
> more.[10]

6 Plaintiff asserts that defendant Hunt was given this form.  Opposition, Document # 67, p. 5.  But

7 even if that were done, it does not suffice to raise a genuine issue of material fact.

8      Plaintiff purports to dispute that defendant Hunt's did not diagnose him, referring

9 him to a dermatologist.  MSJ, Docket # 64-2, p. 2, DUF # 9, Hunt Dec. ¶ 4; Opp., p. 5.  Plaintiff

10 includes an unauthenticated exhibit, JBH(1), a copy of a Health Care Services Physician Request

11 for Services for plaintiff, dated 1/22/04, apparently under Dr. Hunt's name, indicating under

12 "Principle Diagnosis" a word that appears to be "Dermatitis" and requesting an evaluation from

13 defendant Dr. Peterson.  Opp., p. 20, Ex. JBH(1). The lower half of this form was evidently filled

14 in by defendant Peterson and dated 2/25/04 with the findings being "heat rash."  Id.  Plaintiff's

15 evidence in support of his contention that defendant Hunt did diagnose plaintiff is not really

16 substantiated simply because the doctor provided some possibly speculative information on a

17 form, notwithstanding the RJD Medical Services Duty Statement plaintiff submits (Opp., p. 21,

18 Exh. DDS), particularly as defendant Hunt was seeking an evaluation from a specialist.

19      Plaintiff also asserts that when defendant Hunt examined plaintiff's leg and back,

20 that Dr. Hunt stated it was obvious that it was the new style of clothing that was the problem but

21

22      [10] Defendants protest that plaintiff has submitted not only unauthenticated exhibits, but
exhibits that have been altered by markings from the plaintiff. Reply, p. 2. It is true that plaintiff
23 appears on this exhibit to have put large asterisks on certain parts of the document, but it is likely
that the unmarked document could be authenticated.  See Fraser v. Goodale, 342 F.3d 1032, 1036
24 (9th Cir. 2003) (evidence which could be made admissible at trial may be considered on
summary judgment); see also Aholelei v. Hawaii Dept.of Public Safety, 220 Fed. Appx. 670 (9th
25 Cir. 2007).  But defendants also admit that many of plaintiff's unauthenticated documents (in an
unaltered state) are duplicates of defendants' (authenticated) documents. Reply, p. 2.
26 Particularly in light of the liberal construction the court is to lend to plaintiff's efforts to oppose
the motion (Thomas v. Ponder, supra), the undersigned will consider these exhibits.

that he could not give a medical chrono because it was a custody issue. Opp., p. 5.  Plaintiff points to no evidentiary support for this assertion, nor does he make a declaration under penalty of perjury with regard to his contention that defendant Hunt stated that it was obvious the new-style clothing was causing plaintiff's rash.  While his assertion that defendant Hunt gave him skin cream but denied him a chrono that would preclude him from having to wear the new-style clothing is contained within his verified second amended complaint, he does not include the claim that defendant Hunt indicated that the rash was caused by the new clothing.  SAC, pp. 3-4. In his deposition, plaintiff testifies that defendant Hunt told him "Yeah, you're ... you have some rashes and broke out bad" and supplied him with cream to treat the rash "to help me out."  MSJ, Doc. # 66, Ex. 2 to Angus Amended Dec., Ex. A at 52: 3-9.  In fact, under oath plaintiff appears to have fairly definitively undermined his assertion as to defendant Hunt's statement of the cause:

> Q.  Okay.  But again, my question was, Has anybody told you that the clothing is causing the rashes?  I'm not discounting that you're having the rashes.  My question is, Has anybody told you that the clothing is causing those rashes?
>
> A.  No.  They only prescribed skin cream for the rashes.

MSJ, Doc. # 66, Ex. 2 to Angus Amended Dec., Ex. A at 42:12-18.

> Q.  Let me ask you this.  Did Mr. - - - or did Dr. Hunt ever tell you that he knew what was causing your rashes?
>
> A.  No, ma'am.  But he kind of inferred that it had to be from  - - I'm not saying that he directly, but he inferred that, yes, this - - you got a rash, and this is from - - obviously it's from - - because at first it was just back in here, but it had started to spread. So he inferred.  I can't say he directly said that clothing was causing the rashes.  But anybody can, you know, infer what's causing something when you see the direct cause.

Id. at 60:2-12.

Thus, plaintiff has provided no evidence whatever for the assertion that defendant Hunt confirmed that the rash was connected to the new clothing and the undersigned cannot find that plaintiff raises a genuine fact dispute as to that point by a bare assertion.  Although plaintiff

1   contends otherwise, he does not materially dispute defendant Hunt's declaration that a chrono

2   excusing plaintiff from wearing the state-issued clothing was not called for medically.  MSJ,

3   Doc. # 64-4, Hunt Dec., ¶ 7:

> I exercised my training, experience and medical judgment to
> provide [plaintiff] with appropriate medical treatment for his skin
> rash.  I prescribed 2/5% hydrocortisone cream which addressed and
> alleviated the symptoms of the rash.  I referred [plaintiff] to a
> dermatologist to diagnose the cause of the skin rash, and Dr.
> Peterson diagnosed heat rash and ruled out allergies as the cause.
> Hydrocortisone cr[eam] is an appropriate treatment for heat rash.
> Due to the etiology of [plaintiff's] rash, i.e., heat rash, a chrono
> excusing him from wearing CDCR-issued clothing was
> unnecessary and not medically appropriate or justified.

10          As to defendant Peterson, plaintiff insists he told plaintiff that he could not

11  provide a medical chrono to exempt plaintiff from having to wear the new-style clothing

12  pursuant to instruction by the Chief Medical Officer (CMO).  Opp., p. 4.  Plaintiff is supported in

13  contending that defendant Peterson had said that Dr. Ritter, the CMO, had limited the writing of

14  chronos, by reference to the unauthenticated sheet logging an entry for Feb. 25, 2004 regarding

15  plaintiff, evidently signed by "A Peterson," stating in part: "Per Dr. Ritter (CMO) - chronos must

16  be written by yard M.D.(s)."  Opp., p. 25, Ex. AP.  This fact, however, is not really in dispute as

17  defendant Peterson, himself, declares that he is not permitted, as a CDCR contract physician that

18  he is not allowed to issue chronos for inmates.[11]  MSJ, Doc. # 64-5, ¶ 3.  Plaintiff appears to

19  argue that if defendant Peterson knew he could not write a medical chrono, plaintiff should not

20  have been seen by him; however, this might have precluded plaintiff from having been seen by a

_____

[11] In fact, the January 14, 2002, memorandum which addresses the issue of contract
consulting physicians explains that "[t]he purpose of a consultant is to answer a request by a
CDC Staff Physician for impression and recommendation of a diagnosis."  MSJ, Doc. # 64-3, Ex.
2, p. 44; duplicated in the Opposition, Doc. # 67 at p. 23.  The memo indicates that a consultant's
responsibilities do not include writing medication or appliance orders or chronos, but he or she is
to write his or her recommendations on the appropriate form and return them to the staff
physician requesting the consult for a decison "at the sole discretion of the CDC Staff Physician."
Id.  It appears that at least as to prescribing medication, this policy as been modified as defendant
Peterson evidently prescribed skin cream for plaintiff's condition.

15

1  specialist altogether.

2  Defendant Peterson avers in his declaration in addition to stating that plaintiff did

3  not ask him for a chrono excusing him from wearing the standard issue clothing that:

4  [i]t can be seen from a review of [plaintiff's] medical record that
   he is in the habit of demanding chronos for numerous things that
5  are not medically necessary.  Even if he had requested such a
   chrono, I would not have recommended one because I do not
6  believe that such a chrono would be appropriate since ordinary
   clothing is not a factor in atopic dermatitis.  There was no evidence
7  of allergic contact dermatitis, [i]n fact there was no dermatitis at all
   and prisoners are not issued wool clothing.  Even if he found wool
8  to be irritating he could keep it away from his skin by bedding and
   bed clothing.

9

10 MSJ, Doc. # 64-5, Defendant Peterson Dec., ¶ 7.

11 Plaintiff reacts strongly to what he identifies as a false statement by the defendants

12 that he believes the new-style clothing is made of wool.  Opp., p. 5.  However, the statement he

13 identifies specifically sets forth that plaintiff does *not* believe that the new clothing is made with

14 wool (see MSJ, Doc. # 64-1, p. 2:9-11), so his point is not well-taken.  Although plaintiff does

15 not know what materials comprise the large lettering to which he believes his skin is allergic, he

16 believes that the doctors have subjected him to deliberate indifference for not having ordered or

17 engaged some form of "human test" to determine "skin sensitivities."  Opp., p. 4.

18 As to DUF # 22, which sets forth that defendant advised plaintiff to avoid

19 unnecessary sweating, shower and scrub well after exercising, use triamcinolone cream for

20 itching, and return if problems persisted,[12] plaintiff does not take issue with the reference to

21 triamcinolone cream, but disputes that defendant Peterson (again confusing him with Dr.

22 Armstrong, not a party) advised plaintiff to avoid unnecessary sweating, to shower and to scrub

23 well after showering.  Opp., Doc. # 67, pp. 5-6.  Defendant Peterson states under oath that this is

24 what he said, while plaintiff, without a declaration, does point to defendant Peterson's notes of

25

26  [12]  MSJ, Doc. # 64-2, p. 3, DUF # 22, citing Peterson Dec. ¶ 5, [Amended] Angus Dec.,
   Ex. A (plaintiff's Dep.) at 43: 11-15, 56:12-14

the Feb. 25, 2004 exam at his Ex. AP (which although unauthenticated, appears to be a duplicate of Ex. A to defendant Hunt's declaration, with added markings by plaintiff). The court's review of defendant Peterson's notes does not indicate any specific reference to advice to plaintiff regarding sweating, showering or scrubbing, as the notes appear primarily focused on his diagnosis. In any event, whether or not the doctor advised plaintiff with regard to those issues, that so-called dispute is not particularly germane to what is at issue in this action.

On his second visit to defendant Hunt, on March 16, 2004, following his being seen by defendant Peterson, plaintiff disputes that he told defendant Hunt that he believed the rash was the result of wool blankets and RJD's new jeans. MSJ, Doc. # 64-2, p. 4, DUF # 30, Hunt Dec., ¶ 5; Opp., p. 6. Plaintiff insists that he explained that "wool allergy caused rash over stomach, chest, neck, arms, legs, and allergy to new type clothing, allergic to and requested (2) two prong attack to stop rash and itching by hydrocortisone and triamcinolon two & half percent." Opp., p. 6. It is hard to see how this disputes what defendant Hunt stated, except insofar as plaintiff is trying to say that the rash of which he was complaining was not caused by wool. However, plaintiff goes on to assert that defendant Hunt examined his legs and back where the large lettering was, stating (again, apparently, according to plaintiff) that the cause of the rashes being the new clothing was a custody issue. Opp., p. 6. In his declaration, defendant Hunt states that he reviewed defendant Peterson's report and his diagnosis of milliaria or heat rash and that the skin rash was not due to an allergy. MSJ, Doc. # 64-4, Hunt Dec., ¶ 5 and Ex. A, defendant Peterson's report. Defendant Hunt avers that he reviewed the note and findings of the dermatologist (Peterson), and rewrote plaintiff's prescription for 2.5% hydrocortisone cream, discussing the possible side effects of topical cortisone. Id. He also avers that plaintiff did not request a chrono excusing him from wearing the state-issued clothing (id.), while plaintiff again disputes this. Opp., p. 6. As noted, plaintiff also disputes that he did not ask defendant Peterson for a chrono excusing him from wearing the new prison clothing at issue. MSJ, Doc. # 64-2, p. 3, DUF # 22, Peterson Dec. ¶ 25; Opp., p. 6. In any case, even had plaintiff produced sufficient

supporting evidence that he had requested medical chronos from the doctors to be exempt from wearing the new clothing, whether he had done so or not, if defendant doctors in light of their medical expertise, concluded, as they each did, that such a chrono was not called-for, this is a fact dispute that does not rise to the level of being material.  The same applies to whether or not defendant Peterson, as a contract physician, was prohibited by CDCR from issuing medical chronos at RJD, a fact which, as noted, does not appear to be in dispute.  MSJ, Doc. # 64-5, Peterson Dec. ¶ 3.  His failure to write a medical chrono himself does not amount to deliberate indifference not because he is excused by such a policy, but because he remains free to recommend that a CDCR physician issue one and his opinion as a medical expert that one was not warranted in light of his diagnosis.  MSJ, Doc. # 64-5, Peterson Dec. ¶¶ 3, 7.

One fact that is not in dispute, that defendants did not have his medical records when he was being examined by them, serves as a basis for plaintiff's claim that he was subjected to deliberate indifference.  In preparing their declarations, both defendants aver that they have reviewed plaintiff's medical records.  MSJ, Doc. # 64-5, Peterson Dec., ¶ 4.  Defendant Peterson avers that he is board-certified in Dermatology, subcontracted as a dermatologist at Alvarado Hospital, which is contracted with CDCR, and that since about 2000 has worked at RJD as a contract dermatologist.  MSJ, Doc. # 64-5, Peterson Dec., ¶¶ 1-2.  He describes his medical contract at RJD as limited to dermatology consultations, and lists one of his primary duties, in addition to "providing dermatologic examinations, care, and treatment to inmates" as including "reviewing pertinent parts of inmates' medical files."  MSJ, Doc. # 64-5, Peterson Dec., ¶ 2.  Nevertheless, he acknowledges that when he saw plaintiff on the sole occasion of their meeting, on February 25, 2004, plaintiff's "medical record was not available."  MSJ, D MSJ, Doc. # 64-5, Peterson Dec., ¶ 2 oc. # 64-5, Peterson Dec., ¶ 4.  Based, however, on his [subsequent] review of plaintiff's medical record and in his experience with CDCR, defendant Peterson maintains that "the unavailability of an inmate's medical record is a common occurrence."  MSJ, Doc. # 64-5, Peterson Dec., ¶ 4.

1    Defendant Hunt states that he is a licensed physician, specializing in internal

2    medicine, on the medical staff at RJD, who practices general medicine in the yard clinics.  MSJ,

3    Doc. # 64-4, Hunt Dec., ¶ 1.  He, too, indicates that in addition to providing medical

4    examinations, care and treatment of inmates, that one of his primary duties is to review inmates'

5    medical files, but that plaintiff's medical chart was not available for his review in his January 22,

6    2004, initial examination of plaintiff. "[13]   MSJ, Doc. # 64-4, Hunt Dec., ¶¶ 2, 4.  Defendant Hunt

7    explains that it is his experience at CDCR that "the unavailability of an inmate's medical record

8    is a common occurrence because various other parts of the prison need to also review the medical

9    file, e.g., psychiatric department review, medical records updating the chart, chart sent out for

10   outside medical appointment, etc."  MSJ, Doc. # 64-4, Hunt Dec., ¶ 4.  The defendants

11   explanation of the lack of availability of medical records at the time an inmate presents for

12   examination is not entirely satisfactory.  In Wood v. Housewright, supra, 900 F. 2d 1340-41, in a

13   partially dissenting opinion, Ninth Circuit Judge Reinhardt wrote that the failure of the state to

14   make any effort (upon transfer of a prisoner) to obtain medical records until a serious injury was

15   sustained in and of itself constituted an instance of deliberate indifference.   However, the

16   following constitutes the prevailing view where plaintiff's strongest claim for deliberate

17   indifference to a serious medical need was that prison officials' failure to provide his medical

18   records upon his arrival at state prison caused the confiscation of his sling, resulting in the harm

19   of which he complained:

20           This conduct, though apparently inexcusable, does not amount to
             deliberate indifference. While poor medical treatment will at a
21           certain point rise to the level of constitutional violation, mere
             malpractice, or even gross negligence, does not suffice.  Although
22           Wood's treatment was not as prompt or efficient as a free citizen
             might hope to receive, Wood was given medical care at the prison
23           that addressed his needs.  Cf. Ortiz v. City of Imperial, 884 F.2d
             1312 (9th Cir.1989) (deliberate indifference found where police

24

25           [13] Defendant Hunt explicitly states, however, as to his March 16, 2004, visit with the
     plaintiff that he had the February 25, 2004, medical report from the dermatologist, defendant
26   Peterson, which plaintiff does not dispute.  MSJ, Doc. # 64-4, Hunt Dec. ¶ 5.

knew of prisoner's condition and totally failed to treat it competently).

Wood v. Housewright, supra, 900 F. 2d at 1334. "Mere negligence is insufficient for liability. [Citation omitted]. An 'official's failure to alleviate a significant risk that he should have perceived but did not, ... cannot under our cases be condemned as the infliction of punishment.'" Clement v. Gomez, 298 F.3d 898, 904 (9th Cir. 2002), quoting, Farmer v. Brennan, supra, 511 U.S. at 838, 114 S.Ct. 1970.   Plaintiff herein was treated on all three occasions when he was seen by the defendants and plaintiff, unlike the plaintiff in Wood, supra, makes a wholly insufficient showing that the defendants' not having his medical records for review resulted in inadequate medical treatment for his skin rash.

> On January 22, 2004, [plaintiff] was complaining of a skin rash. He told me that he had a limited history of prior skin issues, but that rash was a long term problem.  He asked me to renew a prescription for 2.5% hydrocortisone cream that he had successfully use in the past, which I did.  I examined [plaintiff] and observed that he had a rash and abrasions, possibly from scratching the rash.  He was also complaining of foot pain, for which I did a separate examination.  At that time, I did not have a diagnosis but referred him for specialty care for his feet and skin issues, indicating a referral to the dermatology clinic for evaluation.
>
> At that time [plaintiff] wanted a chrono for the following: 1) low bunk chrono, 2) a chrono allowing him to wear a hat or handkerchief outside; and (3) a shave chrono.  I ordered these chronos, plus chronos for a back brace support (he had his own) and a chrono allowing [plaintiff] to order multivitamins direct from a vendor. [Plaintiff] did not request a chrono excusing him from wearing state-issued prison clothing.

MSJ, Doc. # 64-4, Hunt Dec., ¶ 4.

With the exception that he maintains that he did request the clothing exemption chrono and that the doctor did have a diagnosis of his skin condition (see above), plaintiff disputes none of this.

Defendant Hunt also noted in his review of plaintiff's medical records an August 5, 2004 chart note by a Dr. Marc Armstrong (not a party) at RJD, wherein Dr. Armstrong

1   recommended that plaintiff undergo a RAST blood test that can be used to diagnose specific

2   allergies, such as wool allergies, which plaintiff refused, as well as refusing a follow-up visit,

3   which refusals are set forth among the above undisputed facts.  MSJ, Doc. # 64-4, Hunt Dec., ¶

4   6, and Ex. B, a copy of Dr. Armstrong's chart note.  That chart note, signed "Marc Armstrong"

5   with a date of 8/5/04, also noting plaintiff's age, contains the following handwritten notes:

> Refused to have vital signs done.  Refused to have RAST for wool
> allergy.  Refused to be examined.  Had multiple requests, which
> according to his own records, he has addressed via the 602 appeal
> process and some of which are being litigated.  He was advised to
> reconsider his refusal and follow-up when we have a chart.  He
> refused this as well.

10       Plaintiff does not adequately address or dispute this and it is unclear why he

11  apparently refused to be examined since it appears that he has confused Dr. Armstrong with

12  defendant Peterson.  See Opp., pp. 6, 11-14.

13       Ultimately what plaintiff fails to do is raise a genuine issue of material fact by

14  failing to make the requisite showing that the injury of which he complains rises to the level of

15  an Eighth Amendment violation.  While there is little doubt that a recurring skin rash could be

16  quite uncomfortable, plaintiff does not substantiate the existence of an injury that rises to the

17  level of chronic and substantial pain.  See, e.g., Wood v. Housewright, 900 F. 2d 1332, 1337-41

18  (9th Cir. 1990) (citing cases); Hunt v. Dental Dept., 865 F.2d at, 200-01;  McGuckin v. Smith,

19  974 F.2d at 1059-60, as noted earlier, overruled on other grounds, WMX Technologies v. Miller,

20  104 F.3d 1133 (9th Cir. 1997) (en banc).  Plaintiff maintains defendants have caused him to have

21  to wear additional clothing under the new style clothing in hot weather to prevent rashes.

22  Opposition, Doc. # 67, p. 15.  But he also admits that the prescribed two and a half percent

23  cortisone skin cream would clear up the rashes, notwithstanding that he believes wearing the

24  new style clothing without "some kind of a barrier" such as thermal underwear causes the rashes

25  to reappear.  See, e.g., MSJ, Plaintiff's Dep. 60:13-61:

26       Defendants' argument is well-taken that, at worst, their actions amounted to

negligence.  MSJ, Doc. # 64-1, p. 9.  They point to the evaluation of a "deliberate indifference" claim set forth in Estelle v. Gamble, supra, 429 U.S. at 99 & n. 3 -101, 97 S. Ct. 285, noting that the Supreme Court found that at most the defendant physician, both in his capacity as treating physician and as the corrections department's medical director, committed medical malpractice with regard to treating the prisoner-plaintiff's whose claim of injury arose from a 600-pound cotton bale having fallen on him as he unloaded a truck.  MSJ, Doc. # 64-1, p. 7.  Although plaintiff complained of high blood pressure and a heart problem, the gravamen of his complaint was inadequate treatment of his back injury.  Estelle, supra, 429 U.S. at 107, 97 S. Ct. 285.  The High Court noted that his injury had been diagnosed as "lower back strain and treated ... with bed rest, muscle relaxants and pain relievers," further observing that the Court of Appeals had found that "'[c]ertainly an x-ray of (Gamble's) lower back might have been in order and other tests conducted that would have led to appropriate diagnosis and treatment for the daily pain and suffering he was experiencing.'" Id. [internal citation omitted].  "But," the Estelle Court determined:

> the question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment.  A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice, and as such the proper forum is the state court ....

Id.

Defendants also contend that those cases cited in Estelle as examples of deliberate indifference by prison doctors are not analogous to the situation here.  MSJ., Doc. 3 64-1, p. 7. The Supreme Court cites an instance where the plaintiff alleged that he asked doctors to stitch the severed portion of his ear back on but instead it was thrown away "in front of him" and plaintiff was told "he did not need his ear" and the stump was sewed up.  Estelle, 429 U.S. at 105, n. 10, 97 S. Ct. 285, citing Williams v. Vincent, 508 F.2d 541[, 543-544] ([2nd Cir.] 1974).  In another example, a prisoner claimed that he was given a shot of penicillin even though it was known that

he was allergic and the doctor refused to treat the allergic reaction.  Id., citing Thomas v. Pate, 493 F.2d 151, 158 (7th Cir.), cert. denied sub nom. Thomas v. Cannon, 419 U.S. 879, 95 S.Ct. 143 (1974).[14]  In another case, it was determined that the record did not show when plaintiff was refused treatment by a paramedic "whether he was denied essential medical treatment."  Id., citing Jones v. Lockhart, 484 F.2d 1192 [, 1194] (8th Cir. 1973).  In Martinez v. Mancusi, 443 F.2d 921 (7th Cir.), cert. denied, 401 U.S. 983, 91 S.Ct. 1202 (1971), it was alleged that a prison doctor refused to administer the prescribed pain killer after prisoner underwent leg surgery and was forced to move and stand in contravention of surgeons' specific orders, ultimately rendering leg surgery unsuccessful.  Id.

In a much more recent, but unpublished,[15] Ninth Circuit decision, relying on Estelle, supra, the panel determined that:

> The district court properly granted summary judgment for defendants on Fernandez's deliberate indifference claim because he failed to raise a genuine issue of material fact as to whether their treatment of his hemorrhoids and bacterial skin infection disregarded a substantial risk of serious harm. See Estelle v. Gamble, 429 U.S. 97, 105-06, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (plaintiff must show that the defendants intentionally disregarded a serious medical need); Toguchi [v. Chung], 391 F.3d [1051] at 1058 [9th Cir. 2004) (a difference of medical opinion concerning treatment does not amount to deliberate indifference).

Fernandez v. David, Slip Copy, 2010 WL 3988423 * 1 (9th Cir. 2010).

In another unpublished case,  Tuzon v. Miller, 234 Fed. Appx. 586 (9th Cir. 2007), a Ninth Circuit panel found that plaintiff had "failed to create a triable issue as to whether [defendant] had acted with deliberate indifference to his skin condition," citing Farmer v.

---

[14] The judgment was vacated and the case remanded on other grounds by Cannon v. Thomas, 419 U.S. 813, 95 S. Ct. 288 (1974).

[15] The Ninth Circuit now permits citation to unpublished cases.  Ninth Circuit Rule 36-3, in accordance with Fed. R. App. P. 32.1, permits citation to unpublished dispositions and orders issued on or after January 1, 2007.  However, such rulings "are not precedent, except when relevant under the doctrine of law of the case or rules of claim preclusion or issue preclusion." Ninth Circuit Rule 36-3(a).

1   <u>Brennan</u>, 511 U.S. at 847, 114 S.Ct. 1970, for the principle that "to be liable for deliberate

2   indifference, a prison official must know of and disregard a substantial risk of serious harm to an

3   inmate."

4           In yet another instance, a physician who provided no treatment whatever for an

5   alleged skin condition was found not to have been deliberately indifferent to a serious medical

6   need.

7           Here, the undisputed evidence shows that Plaintiff was seen by Dr.
            Vo for an alleged skin condition. At that time, Plaintiff did not
8           state he was in extreme pain.  Dr. Vo examined Plaintiff and
            determined no medical treatment was necessary.  Plaintiff did not
9           seek follow-up treatment for the skin condition. There is no
            evidence that the skin condition affected Plaintiff's daily activities
10          or that it caused him substantial pain.  Accordingly, Plaintiff has
            not presented evidence showing his condition qualified as a
11          "serious medical need."  <u>Lopez</u>, 203 F.3d at 1131. Moreover,
            Plaintiff has not presented any evidence that Dr. Vo disregarded an
12          excessive risk to Plaintiff's health. The only evidence presented to
            the Court is that Plaintiff disagrees with Dr. Vo's opinion regarding
13          proper medical treatment. This is not sufficient to establish a
            deliberate indifference claim. See <u>Jackson v. McIntosh</u>, 90 F.3d
14          330, 332 (9th Cir.1996) (stating difference of opinion does not
            support deliberate indifference claim)."  <u>Johnson v. Sullivan</u>,  2010
15          WL 2850787 *2 (E.D.Cal. 2010).

16  While plaintiff did seek further treatment from defendant Hunt, on one further occasion, wherein

17  he actually was prescribed medication, there appears to be no material dispute that he did not

18  seek a further consultation with defendant Peterson.  And when a non-party doctor sought to test

19  and treat him, he refused medical treatment, apparently bent only on his own self-prescribed

20  solution.  But, as noted, mere differences of opinion concerning the appropriate treatment cannot

21  be the basis of an Eighth Amendment violation.  <u>Jackson v. McIntosh</u>, <u>supra,</u> 90 F.3d 330;

22  <u>Franklin v. Oregon</u>, 662 F.2d at 1344; <u>see also</u>, Scott v. Moore, 2010 WL 1404411 *4 (E.D. Cal.

23  2010) (summary judgment for defendant found proper where plaintiff was undisputedly treated

24  by defendant for skin condition but had a difference of opinion as to appropriate medication).

25  Plaintiff has no expert opinion to substantiate his claim of deliberate indifference.  <u>Hutchinson v.</u>

26  <u>United States</u>, <u>supra</u>, 838 F.2d 390.  There is no showing, despite subsidiary issues of fact in

1   dispute, by plaintiff of a material issue of fact and, as noted, the dispositive question on this

2   summary judgment motion is ultimately <u>not</u> what was the most appropriate course of treatment

3   for plaintiff, but whether the failure to timely give a certain type of treatment was, in essence,

4   criminally reckless.  Plaintiff has not met that burden.

5              *Qualified Immunity*

6              Defendants contend that defendants Hunt and Peterson are entitled to qualified

7   immunity.  Docket # 64-1, MSJ, pp. 9-11. Because, however, the undersigned has found that

8   plaintiff fails to raise a genuine material fact dispute with respect to the question of deliberate

9   indifference as to either defendant, this argument need not be reached.

10             The Court agrees with Defendant-the undisputed facts in this case
              show that Gemmet did not violate Cosco's Eighth Amendment
11            rights because she did not knowingly disregard Cosco's medical
              needs when treating him for eczema. To the contrary, she evaluated
12            his skin condition pursuant to proper nursing protocol, offered
              hydrocortisone, and scheduled him for a doctor's appointment.
13            Cosco received that doctor's visit within the time recommended by
              Defendant.  Cosco did not suffer any harm as a result of
14            Defendant's actions.  For this reason, Gemmet is entitled to
              summary judgment on Cosco's claim of deliberate medical
15            indifference.  Having found no constitutional violation, the Court
              will not engage in a qualified immunity analysis."

16

17  <u>Cosco v. Gemmet</u>, 2010 WL 1948304 *6 (E.D.Cal. 2010).

18             The defendant doctors in this instance similarly did not fail to treat plaintiff's skin

19  condition and, notwithstanding that he may believe otherwise, plaintiff has failed to make a

20  material showing of harm or of inadequate medical care as result of the treatment he did receive

21  from them.

22             Accordingly, IT IS RECOMMENDED that defendants' May 21, 2010 (docket #

23  64), motion for summary judgment be granted and judgment be entered for defendants.

24             These findings and recommendations are submitted to the United States District

25  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

26  days after being served with these findings and recommendations, any party may file written

objections with the court and serve a copy on all parties.  Such a document should be captioned

"Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

shall be served and filed within fourteen days after service of the objections.  The parties are

advised that failure to file objections within the specified time may waive the right to appeal the

District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED: 12/16/2010

        /s/ Gregory G. Hollows

        _____

        UNITED STATES MAGISTRATE JUDGE

GGH:009
wils0791.msj